# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMSC-006

Filing Date: February 21, 2012

Docket No. 33,386

ANTONIO MAESTAS and
BRIAN FRANKLIN EGOLF, JR., members of
the New Mexico House of Representatives,
and JUNE LORENZO, ALVIN WARREN,
ELOISE GIFT and HENRY OCHOA,

      Petitioners,

v.

HON. JAMES A. HALL, District Judge
Pro Tempore of the First Judicial District
Court,

      Respondent,

and

SUSANA MARTINEZ, in her capacity as
Governor of New Mexico, et al.,

      Real Parties in Interest,

and

MAURILIO CASTRO, BRIAN FRANKLIN EGOLF, JR., MEL HOLGUIN,
HAKIM BELLAMY and ROXANE SPRUCE BLY, PUEBLO OF LAGUNA,
PUEBLO OF ACOMA, JICARILLA APACHE NATION, PUEBLO OF ZUNI,
PUEBLO OF SANTA ANA, PUEBLO OF ISLETA, RICHARD LUARKIE,
HARRY A. ANTONIO, JR., DAVID F. GARCIA, LEVI PESATA and LEON
REVAL, NAVAJO NATION, LORENZO BATES, DUANE H. YAZZIE, RODGER
MARTINEZ, KIMMETH YAZZIE and ANGELA BARNEY NEZ,

      Intervenors.

**CONSOLIDATED WITH**

1

**Docket No. 33,387**

**TIMOTHY Z. JENNINGS, in**
**his official capacity as President**
**Pro Tempore of the New Mexico**
**Senate, and BEN LUJAN, SR., in**
**his official capacity as Speaker of**
**the New Mexico House of Representatives,**

  **Petitioners,**

**v.**

**THE NEW MEXICO COURT OF APPEALS,**

  **Respondent,**

**and**

**DIANNA J. DURAN, in her official**
**capacity as New Mexico Secretary of State,**
**SUSANA MARTINEZ, in her capacity as**
**New Mexico Governor, and JOHN A.**
**SANCHEZ in his official capacity as New**
**Mexico Lieutenant Governor and presiding**
**officer of the New Mexico Senate,**

  **Real Parties in Interest,**

**and**

**JONATHAN SENA, DON BRATTON, CARROLL LEAVELL, GAY KERNAN,**
**CONRAD JAMES, DEVON DAY, MARGE TEAGUE, MONICA YOUNGBLOOD,**
**JUDY MCKINNEY, JOHN RYAN, MAURILIO CASTRO, BRIAN F. EGOLF,**
**JR., MEL HOLGUIN, HAKIM BELLAMY and ROXANE SPRUCE BLY,**
**PUEBLO OF LAGUNA, PUEBLO OF ACOMA,**
**JICARILLA APACHE NATION, PUEBLO OF ZUNI, PUEBLO OF SANTA ANA,**
**PUEBLO OF ISLETA, RICHARD LUARKIE, HARRY A. ANTONIO, JR., DAVID**
**F. GARCIA, LEVI PESATA and LEON REVAL, NAVAJO NATION, LORENZO**
**BATES, DUANE H. YAZZIE, RODGER MARTINEZ, KIMMETH YAZZIE and**
**ANGELA BARNEY NEZ,**

  **Intervenors.**

**ORIGINAL PROCEEDINGS**

Jones, Snead, Wertheim & Wentworth, P.A.
John V. Wertheim
Jerry Todd Werthiem
Santa Fe, NM

The Law Office of Katherine Ferlic
Katherine Ferlic
Santa Fe, NM

Thompson Law Firm
David K. Thompson
Santa Fe, NM

for Petitioners Antonio Maestas, June Lorenzo, Eloise Gift, Alvin Warren and Henry Ochoa

Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Luis G. Stelzner
Sara N. Sanchez
Albuquerque, NM

Hinkle, Hensley, Shanor & Martin, L.L.P.
Richard E. Olson
Jennifer M. Heim
Roswell, NM

for Petitioners Timothy Z. Jennings and Ben Lujan, Jr.

The Egolf Law Firm, L.L.C.
Brian Franklin Egolf, Jr., Pro Se
Santa Fe, NM

for Petitioner

Kennedy & Han, P.C.
Paul J. Kennedy
Albuquerque, NM

Jessica M. Hernandez
Matthew J. Stackpole
Santa Fe, NM

for Real Party in Interest Governor Susana Martinez

Peifer, Hanson & Mullins, P.A.
Charles R. Peifer
Robert E. Hanson
Matthew R. Hoyt
Albuquerque, NM

for Real Party in Interest John A. Sanchez

Doughty & West, P.A.
Robert M. Doughty, III
Judd C. West
Albuquerque, NM

for Real Party in Interest Dianna J. Duran

Freedman Boyd Hollander Goldberg Ives & Duncan, P.A.
Joseph Goldberg
John Warwick Boyd
David Herrera Urias
Albuquerque, NM

Garcia & Vargas, L.L.C.
Ray M. Vargas, II
David P. Garcia
Erin O'Connell
Santa Fe, NM

for Intervenors Maurilio Castro, Brian F. Egolf, Jr., Mel Holguin, Hakim Bellamy
and Roxane Spruce Bly

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Patrick J. Rogers
Albuquerque, NM

Scott & Kienzle, P.A.
Duncan Scott
Paul M. Kienzle, III
Albuquerque, NM

for Intervenors Jonathan Sena, Don Bratton, Carroll Leavell, and Gay Kernan
Rodey, Dickason, Sloan, Akin & Robb, P.A.
Henry M. Bohnhoff

Albuquerque, NM

Saucedo Chavez, P.C.
Christopher Saucedo
Iris L. Marshall
Albuquerque, NM

David A. Garcia, L.L.C.
David A. Garcia
Albuquerque, NM

for Intervenors Conrad James, Devon Day, Marge Teague, Monica Youngblood, Judy McKinney and John Ryan

Nordhaus Law Firm, L.L.P.
Teresa Isabel Leger
Cynthia Kiersnowski
Santa Fe, NM

Casey Douma
Laguna, NM

for Intervenors Pueblo of Laguna, Pueblo of Acoma, Jicarilla Apache Nation, Pueblo of Zuni, Pueblo of Santa Ana, Pueblo of Isleta, Richard Luarkie, Harry A. Antonio, Jr., David F. Garcia, Levi Pesata and Leon Reval

Wiggins, Williams & Wiggins, P.C.
Patricia G. Williams
Jenny Dumas
Albuquerque, NM

Dana Lee Bobroff
Window Rock, AZ

for Intervenors Navajo Nation, Lorenzo Bates, Duane H. Yazzie, Rodger Martinez, Kimmeth Yazzie and Angela Barney Nez

## OPINION

**CHÁVEZ, Justice.**

**{1}** One of the most precious personal rights in a free society is the right to vote for the candidate of one's choice. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The right to vote is the essence of our country's democracy, and therefore the dilution of that right strikes at

5

the heart of representative government. The idea that every voter must be equal to every other voter when casting a ballot has its genesis in the Equal Protection Clause, U.S. Const. amend. XIV, § 1 (Equal Protection Clause), and is commonly referred to as the "one person, one vote" doctrine. As stated by the United States Supreme Court in the seminal case of *Reynolds v. Sims*, 377 U.S. 533, 577 (1964), "[b]y holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." Therefore, when it comes to preserving an adult citizen's right to vote, there is no more important task for the Legislature and the Governor to perform than the decennial reapportionment of districts for state and national elective offices.

**{2}** At issue in this case is the apportionment of the New Mexico House of Representatives following the 2010 federal census. It is undisputed that the House of Representatives at this time is unconstitutionally apportioned. The Legislature passed House Bill 39, which reapportioned the House, during the 2011 Special Session. Governor Susana Martinez vetoed House Bill 39.[1] Because the lawmaking process failed to create constitutionally-acceptable districts, the burden fell on the judiciary to draw a reapportionment map for the House. To accomplish this we designated retired District Judge James Hall, a hard-working jurist with an impeccable reputation for both fairness and impartiality, to assume this arduous undertaking.

**{3}** After eight days of testimony and the submission of numerous reapportionment maps by the parties, the district court adopted, in part, the third alternative plan submitted by the attorneys representing Governor Martinez and Lieutenant Governor John Sanchez (Executive Alternative Plan 3). Petitioners filed petitions for a writ of superintending control asking this Court to assume jurisdiction over the case. Petitioners asked this Court to either reverse the district court and adopt an alternative plan or remand the case with instructions regarding the legal standards that the district court should apply. Petitioners argued that the district court incorrectly applied the law for reapportionment (1) by not protecting against the dilution of minority voting rights under the Voting Rights Act; (2) by prioritizing the smallest deviations from ideal population equality over the traditional redistricting principles; and (3) by selecting a partisan plan. In addition, Petitioners raised issues such as due process and separation of powers that were addressed in an order we entered on February 10, 2012, or that are otherwise deemed to be without merit.

**{4}** We granted Petitioners' requests for writs of superintending control by assuming jurisdiction in this matter and established an extremely expedited briefing schedule designed

---

[1]The Legislature was unable to pass reapportionment legislation relating to the Congress. Governor Martinez vetoed legislation reapportioning the Public Regulation Commission and the state Senate. The district court's decision regarding these elective offices is not challenged.

to permit this Court to conduct oral argument and issue a decision forthwith in an effort not to delay the House elections. Before this year this Court had never been asked to decide the legal principles that would govern our courts when they draw reapportionment maps. After reading the parties' briefs and listening to oral argument, we entered an order articulating the legal principles that should govern redistricting litigation in New Mexico and remanded the case to the district court for further proceedings consistent with the order.

## BACKGROUND AND PROCEDURAL HISTORY

{5}    The House of Representatives must be composed of seventy members elected from single-member districts that are contiguous and as compact as is practicable and possible. N.M. Const. art. IV, § 3(C); NMSA 1978, § 2-7C-3 (1991). The 2010 federal census indicates that the population in New Mexico is 2,059,179 people, an increase of 13.2 percent over the population documented by the 2000 census. *Profile of General Characteristics for the United States*, United States Census Bureau (2010). The ideal House district population, under the one person, one vote principle, would be 29,417 people. The current House districts deviate from the ideal population with percent deviations ranging from negative 24.3 to a positive 100.9, for a total deviation range of 125.2 percent. The population in West Albuquerque and Rio Rancho indicate that these areas combined can support three additional house districts. Slower growth in North Central New Mexico, Southeastern New Mexico, and Central Albuquerque indicate that these areas each currently have one district too many.

{6}    The need to reapportion elected offices in the New Mexico House of Representatives is readily apparent from the above summary of population growth and shifts. The Legislature has the responsibility to reapportion its membership. *See* N.M. Const. art. IV, § 3(D). The bipartisan New Mexico Legislative Council unanimously adopted "Guidelines for the Development of State and Congressional Redistricting Plans" and formed a bipartisan Interim Redistricting Committee to prepare to fulfill the Legislature's constitutional responsibility. The Interim Redistricting Committee developed redistricting plans and invited public input regarding the plans so as to make recommendations to the Legislature in advance of the September 6, 2011 Special Session called by Governor Martinez.

{7}    During the summer of 2011, the Interim Redistricting Committee held public hearings throughout New Mexico and gathered input from citizens and special interest groups. Possible redistricting plans were presented to the public for their input. Demographer Brian Sanderoff and his company, Research & Polling, Inc., worked with Republican and Democrat legislators to create plans requested by individual legislators or their caucuses. A common theme expressed by citizens during these hearings was their desire to keep their municipalities and communities unified so that their representatives would better represent their interests and values. The Native American leadership fully participated in the public meetings and worked closely with the Legislature throughout the process to convey their concerns and preferences for Native American voting districts. The Native American leaders also attempted to communicate with the Governor's Office both prior to and during the Special Session to convey their preferences, but they did not receive

7

a response.

**{8}** During the entire legislative process, including the Special Session, over 200 redistricting plans were drafted by Research & Polling. Many of those plans were introduced during the Special Session and debated in committee and on the floor of both legislative chambers. No redistricting plan introduced during the Special Session was identified as proposed or approved by Governor Martinez. House Bill 39, which reapportioned the House, passed both the House and the Senate without a single Republican vote in favor of the bill. Governor Martinez later vetoed the bill.

**{9}** Numerous complaints by various parties were filed in different state district courts challenging the constitutionality of the current distribution of voters under the State and Congressional maps. We found it appropriate to exercise our superintending control because this is not the first time New Mexico courts have been imposed upon to reapportion political maps. *See Jepsen v. Vigil-Giron*, No. D-0101-CV-02177 (N.M. D. Ct. January 24, 2002). We consolidated all of the cases and appointed retired District Judge James Hall to preside over the redistricting litigation.

**{10}** During the trial, the district court was initially presented with six complete House redistricting plans: (1) the Legislative Plan passed by the Legislature as House Bill 39; (2) the Executive Plan; (3) the James Plan; (4) the Sena Plan; (5) the Egolf Plan; and (6) the Maestas Plan. The Multi-Tribal/Navajo Nation plaintiffs also submitted partial plans to address the concerns of the Native American population in New Mexico. As the trial progressed, nine additional plans were tendered by certain parties, some to address criticisms raised during the testimony of various witnesses and others to respond to the district court's request. In addition to numerous lay witnesses, seven expert witnesses, some demographers and other political scientists, testified in favor of and in opposition to certain maps.

**{11}** The executive plaintiffs tendered Executive Alternative Plan 3, which was adopted in part by the district court, into evidence on the last day of testimony. The Governor's demographer who drew the plan was not available to testify. In addition, other expert witnesses who had previously introduced methodologies for assessing the partisan performance of plans and compliance with historic state policies were also not available to testify. Brian Sanderoff, the earlier-mentioned demographer, who had assisted legislators from all parties to prepare redistricting maps, testified about Executive Alternative Plan 3. He noted that the plan had significant partisan performance changes and that the plan could have been drawn without such significant changes.

**{12}** The district court entered detailed findings of fact and conclusions of law rejecting the Legislative Plan and other plans submitted by the parties. The Legislative Plan was rejected because it systematically left North Central and Southeastern New Mexico underpopulated, which diluted the votes of the persons in the more populated areas of the state: specifically West Albuquerque, Rio Rancho, and Doña Ana County. An overriding, related concern was the Legislative Plan's failure to consolidate a district in North Central

8

New Mexico. The district court rejected another proposed plan because of "significant partisan bias." It rejected one plan because of "highly partisan incumbent pairings" and another plan because of the pairing of "the only Republican incumbent in north central New Mexico with a Democratic incumbent and splits Los Alamos [from] White Rock." Other plans were rejected because of the failure "to establish Native American districts as contained in the Multi-Tribal/Navajo Nation Plan under the Voting Rights Act."

{13}    The district court adopted Executive Alternative Plan 3, with a minor modification, because it found that the plan prioritized low population deviations between districts, adhered to the requirements of the Voting Rights Act, and reasonably satisfied secondary reapportionment policies. The district court acknowledged that Executive Alternative Plan 3 impacted partisan performance measures, but determined that because all of the plans had some partisan effect, it was compelled not to allow partisan considerations to control the outcome of its decision.

## GOVERNING PRINCIPLES

{14}    Our review of whether the district court applied the correct legal standards in selecting a redistricting plan is de novo. *Strausberg v. Laurel Healthcare Providers, LLC*, 2012-NMCA-006, ¶ 6, 269 P.3d 914. As mentioned earlier, the "one person, one vote" doctrine applied by the United States Supreme Court in *Reynolds*, 377 U.S. at 558 (internal quotation marks and citation omitted), is grounded in the Equal Protection Clause. This doctrine prohibits the dilution of individual voting power by means of state districting plans that allocate legislative seats to districts of unequal populations, thereby diminishing the relative voting strength of each voter in overpopulated districts. While the United States Supreme Court has held that population equality is the paramount objective of apportionment for congressional districts, *Karcher v. Daggett*, 462 U.S. 725, 732-33 (1983), state legislative district plans require only "*substantial*" population equality, *see Gaffney v. Cummings*, 412 U.S. 735, 748 (1973). According to the results of the 2010 census, ideal population equality among each of the seventy House Districts in New Mexico would be 29,417 persons. However, such mathematical precision is not mandated by the Equal Protection Clause. *See Reynolds*, 377 U.S. at 577. Adherence to the requirements of the Voting Rights Act is essential, and justifiable considerations, such as incorporating legitimate and rational state policies relevant to our representative form of government, may result in deviations from ideal population equality. *See id.* at 577-81.

## VOTING RIGHTS ACT

{15}    Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, prohibits any State or political subdivision from imposing any electoral practice "which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). If districts are drawn in such a way that a bloc voting majority is usually able to defeat candidates supported by a politically cohesive, geographically insular minority group of sufficient size, those districts will not be in compliance with

Section 2. *Thornburg v. Gingles*, 478 U.S. 30, 49 (1986). The *Gingles* Court defined three threshold conditions for establishing a Section 2 violation. "[T]he minority group must be able to demonstrate [(1)] that it is sufficiently large and geographically compact to constitute a majority in a single-member district[; (2)] that it is politically cohesive[; and (3)] that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id.* at 50-51 (footnotes omitted). If these three preconditions are established, then a violation of Section 1973(a) of the Voting Rights Act occurs if

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [racial group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

**{16}** The essential inquiry is whether, as a result of the way the districts are structured, the protected minority group does "not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Gingles*, 478 U.S. at 44 (internal quotation marks and citation omitted). Relevant to this essential inquiry are the non-exclusive factors set forth in the Senate Report on the 1982 amendments to the Voting Rights Act, which include

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group . . .; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction. The Report notes also that evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group and that the policy underlying the State's or the political subdivision's use of the contested practice or structure is tenuous may have probative value.

*Gingles*, 478 U.S. at 44-45 (citing S. Rep. No. 97-417 (1982), at 28-29, U.S. Code Cong. & Admin. News 1982, at 205-07).

**{17}** For the purposes of Section 2 of the Voting Rights Act, only eligible voters affect a group's opportunity to elect candidates. Therefore, the question is whether the minority group has a citizen voting-age majority in the district. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 427-29 (2006). Also under Section 2, because the injury is

vote dilution, the *Gingles* compactness inquiry considers "the compactness of the minority population, not . . . the compactness of the contested district." *Bush v. Vera*, 517 U.S. 952, 997 (Kennedy, J., concurring) (referring to *Gingles*, 478 U.S. 30). A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. *Id.* at 979. Section 2 compactness should take into consideration "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* at 977; *see also Shaw v. Reno*, 509 U.S. 630, 647 (1993) (reasoning that traditional districting principles "are important not because they are constitutionally required—they are not—but because they are objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines").

**{18}**    In this case, the district court's Findings of Fact 42 through 60 support adopting the Multi-Tribal/Navajo Nation partial plan. These findings by the district court have not been challenged on appeal, and therefore any redistricting plan must contain the Multi-Tribal/Navajo Nation partial plan.

**{19}**    The Egolf petitioners, however, have raised the issue of whether the district court applied the correct legal standard to its analysis of the Hispanic community in and around Clovis, New Mexico. The district court found that "[t]he Hispanic community in and around Clovis is sufficiently large and geographically compact to constitute a majority in a single-member district," that the community "is politically cohesive," and that "Anglos in the area vote sufficiently as a bloc to enable them to usually defeat the minority's preferred candidate."

**{20}**    A federal three-judge panel had previously found a detailed history of racial and ethnic discrimination affecting the Clovis minority population. *Sanchez v. King*, No. 82-0067-M (D.N.M. 1984). That panel found a violation of federal law and redrew House District 63 to include compact and politically cohesive Clovis minorities and make the district a performing, effective, majority-minority district. *Id.* "Of course, the federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law. But that does not mean that the State's powers are similarly limited." *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). Although House District 63 was reshaped in the *Jepsen* court-ordered redistricting plan, it remains an effective majority-minority district. In the present trial, there was no evidence to establish that the relevant population had materially changed so as to no longer require an effective majority-minority district. Therefore, the same considerations that led to a redrawing of House District 63 in 1984 continue to be relevant to the history of voting-related discrimination in this area. As a result, on remand the district court should determine whether the relevant population is an effective Hispanic citizen voting-age population. Any redistricting plan ultimately adopted by the district court should maintain an effective majority-minority district in and around the Clovis area unless specific findings are made based on the record before the district court that Section 2 Voting Rights Act considerations are no longer warranted.

**MINOR DEVIATIONS BASED ON LEGITIMATE AND RATIONAL STATE**

11

**POLICY ARE PERMISSIBLE**

**{21}**     Although ideal population equality and whether a plan dilutes the vote of any racial minority are primary considerations in drawing a districting map, minor deviations from absolute population equality are tolerated to permit states to pursue legitimate and rational state policies relevant to our representative government. *See Mahan v. Howell*, 410 U.S. 315, 321-22 (1973) (recognizing that more flexibility is constitutionally permissible with respect to state legislative reapportionment than in congressional reapportionment). We interpret the United States Supreme Court to require courts to consider "the policies and preferences of the State, as expressed in statutory and constitutional provisions or in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not detract from the requirements of the Federal Constitution." *White v. Weiser*, 412 U.S. 783, 795 (1973). Adhering to state policies is a way in which courts can give effect to the will of the majority of the people. *Preisler v. Secretary of State*, 341 F. Supp. 1158, 1161-62 (D.C. Mo. 1972).

**{22}**     Because the promotion of legitimate and rational state policies will often necessitate "minor deviations" from absolute population equality, the United States Supreme Court has held that such minor deviations alone are insufficient to establish a prima facie case of invidious discrimination. *Voinovich*, 507 U.S. at 161. So what constitutes a minor deviation? In *Brown v. Thomson*, 462 U.S. 835, 842 (1983), the United States Supreme Court held that redistricting plans with a maximum population deviation below ten percent fall within the category of minor deviations that are insufficient to establish a prima facie violation of the Equal Protection Clause.

**{23}**     The following methodology is used to calculate deviation percentages. First, the population deviation of a district is the percentage by which a district's population is above or below the ideal population. The ideal population is determined by dividing the total population by the total number of districts in the state. "Total deviation" is determined by adding the absolute deviation of the district with the largest population to the absolute deviation of the district with the smallest population. The total deviation can also be thought of as the range of population deviations.

**{24}**     If ten percent is the maximum allowable deviation, then a legislative plan with five percent deviations or less in each district will be prima facie constitutional because the total absolute deviation will not exceed ten percent. Conversely, legislative plans with a total population deviation greater than ten percent are prima facie unconstitutional. *See Brown*, 462 U.S. at 842-43. The New Mexico State Legislature has declared it to be state policy not to consider a redistricting plan that includes any district with a total population that deviates more than plus or minus five percent from ideal. Thus, no district may contain a population that deviates more than plus or minus 1,470 persons from the ideal population of 29,417.

**{25}**     However, simply because a plan has minor deviations that are prima facie constitutional does not mean that such plans are immune from judicial challenge. *See Larios*

12

*v. Cox*, 300 F. Supp. 2d 1320, 1340-41 (N.D. Ga. 2004) (rejecting Georgia's redistricting plans for its state legislature, although the plans contained maximum deviations under ten percent). An equal protection challenge will lie "if the plaintiff can present compelling evidence that the drafters of the plan used illegitimate reasons for population disparities and created the deviations *solely* to benefit certain regions at the expense of others." *See Legislative Redistricting Cases*, 629 A.2d 646, 657 (Md. 1993).

**{26}**   Yet plans with prima facie constitutional ten-percent deviations are plans drawn by a legislature that have become law. In contrast to legislatively-drawn plans, court-drawn plans are held to a higher standard, and "must ordinarily achieve the goal of population equality with little more than de minimus variation." *Chapman v. Meier*, 420 U.S. 1, 27 (1975). The United States Supreme Court has not defined what constitutes de minimus variations for a court-drawn plan.[2] However, unlike a legislative body that does not have to articulate the policy reasons for minor deviations from ideal population equality, unless the range of deviations exceeds ten percent, a court must enunciate the historically significant state policy or unique features that it relies upon to justify deviations from ideal population equality. *Connor v. Finch*, 431 U.S. 407, 419-20 (1977).

## PERMISSIBLE STATE POLICIES WHICH JUSTIFY POPULATION DEVIATIONS

**{27}**   When called upon to draw a redistricting map, a court acts in equity and may adopt a plan submitted by a party, modify such a plan, or draw its own map. *See O'Sullivan v. Bryer*, 540 F. Supp. 1200, 1202-03 (D.C. Kan. 1982). The most fundamental tenet of judicial administration and independence is that "the process must be fair, and it must [also] appear to be fair." *See Peterson v. Borst*, 786 N.E.2d 668, 673 (Ind. 2003) (internal quotation marks and citation omitted). This concept of judicial independence, that judges decide the merits of a case based on the facts and the law before them, without fear or favor, is particularly important in this area, which is fundamentally a political dispute. As Justice Felix Frankfurter observed in *Colegrove v. Green*, 328 U.S. 549, 554 (1946), "[t]he one stark fact that emerges from a study of the history of [legislative] apportionment is its embroilment in politics, in the sense of party contests and party interests." Thus, his strong recommendation was that "[c]ourts ought not to enter this political thicket." *Id.* at 556. Unfortunately, because of the inability of our sister branches of government to find a way to work together and address the most significant decennial legislation to affect the voting rights of the adult citizens of our State, the judiciary in New Mexico finds itself embroiled in this political thicket.

---

[2]Deviations in court-drawn maps have varied with some in the range of five to ten percent. *See Burling v. Chandler*, 804 A.2d 471 (N.H. 2002) (per curiam) (court-drawn map with 9.26 percent deviations in House plan); *Below v. Gardner*, 963 A.2d 785 (N.H. 2002) (court-drawn map with 4.96 percent deviations in Senate plan); *Chapman v. Meier*, 407 F. Supp. 649 (D.N.D 1975), *on remand from* 420 U.S. 1 (1975) (court-drawn map with 6.6 percent deviations).

13

**{28}** Because the redistricting process is embroiled in partisan politics, when called upon to draw a redistricting map, a court must "do so with both the appearance and fact of scrupulous neutrality." *Peterson*, 786 N.E.2d at 673. To avoid the appearance of partisan politics, a judge should not select a plan that seeks partisan advantage. Thus, a proposed plan that seeks to change the ground rules so that one party can do better than it would do under a plan drawn up by someone without a political agenda is unacceptable for a court-drawn plan. *See Wilson v. Eu*, 823 P.2d 545, 576-77 (Cal. 1992) (in bank) (rejecting plans submitted by the parties because each had calculated partisan political consequences, the details of which were unknown, leaving no principled way for the court to choose between the plans, while knowing that the court would be endorsing an unknown but intended political consequence if it chose one of the plans).

**{29}** A court's adoption of a plan that represents one political party's idea of how district boundaries should be drawn does not conform to the principle of judicial independence and neutrality. *Peterson*, 786 N.E.2d at 673. Although some courts are indifferent to political considerations such as incumbency or party affiliation, *Burling v. Chandler*, 804 A.2d 471, 474 (N.H. 2002) (per curiam), other courts question the wisdom of such indifference, *Gaffney*, 412 U.S. at 753 ("It may be suggested that those who redistrict and reapportion should work with census, not political, data and achieve population equality without regard for political impact. But this politically mindless approach may produce, whether intended or not, the most grossly gerrymandered results.").

**{30}** The district court heard several of the parties' expert witnesses testify about court-drawn plans and partisan neutrality. One of the executive's expert witnesses who testified in this case agreed that a court should not select a plan that gives one political party a partisan advantage. Dr. Keith Gaddie testified that how political balance is shifted by the court plan when compared to the baseline map is an important consideration. Dr. Theodore Arrington also testified that when courts draw redistricting plans, there is more partisan balance and more competitive districts. Dr. Thomas Lloyd Brunell, the executive's other expert witness, put it more bluntly: "[c]ourts . . . try not to advance the purposes or the ability of one party to really elect a lot more people than the status quo. . . ." Whether these experts would have expressed concern about Executive Alternative Plan 3 is not known because they had testified before this plan was introduced into evidence.

**{31}** Despite our discomfort with political considerations, we conclude that when New Mexico courts are required to draw a redistricting map, they must do so with the appearance of and actual neutrality. The courts should not select a plan that seeks partisan advantage. As was evident from the numerous plans drawn in this case, parties are capable of drawing maps that seek to give themselves a partisan advantage. This was true even when the party was able to maintain de minimus population deviations. When a court is required to draw a redistricting map, it is a desirable goal for the court to draw a partisan-neutral map that complies with both the one person, one vote doctrine and the requirements of the Voting Rights Act. To accomplish this goal, partisan symmetry may be one consideration. Although partisan asymmetry is not a reliable measure of *unconstitutional* partisanship,

14

*League of United Latin Am. Citizens*, 548 U.S. at 420, it should be considered as "a measure of partisan fairness in electoral systems," *id.* at 466 (Stevens, J., concurring in part and dissenting in part). In addition, maintaining the political ratios as close to the status quo as is practicable, accounting for any changes in statewide trends, will honor the neutrality required in such a politically-charged case. Districts should be drawn to promote fair and effective representation for all, not to undercut electoral competition and protect incumbents. It is preferable to allow the voters to choose their representatives through the election process, as opposed to having their representative chosen for them through the art of drawing redistricting maps. We believe that consistent and non-discriminatory application of historic legislative redistricting policies, in conjunction with limited flexibility in the court's search for ideal population equality, will be effective tools in drawing redistricting maps that avoid partisan advantage. In applying these rules, a court may be well advised to employ the services of an expert under Rule 11-706 NMRA.

**{32}** However, because redistricting is primarily the responsibility of the State Legislature, courts must look at previous plans and policies when drawing redistricting maps. Even plans that pass the Legislature but fail to be enacted into law, such as House Bill 39, are due "thoughtful consideration." *See Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 197 (1972). Thoughtful consideration is important because redistricting ordinarily involves criteria, policies, and standards that have been publicly deliberated by both the legislative and the executive branches of government in the exercise of their political judgment. More importantly, it is during the legislative process that the public regularly participates by commenting on policies and plans and observing the legislators deliberate the virtues of different policies and plans during open meetings. The Legislature is the voice of the people, and it would be unacceptable for courts to muzzle the voice of the people simply because the Legislature was unable, for whatever reason, to have its redistricting plan become law.

**{33}** Adhering to policies adopted by the Legislature gives effect to the will of the majority of the people and is permissible in redistricting litigation. *See White*, 412 U.S. at 795-96. Other courts have looked to state policies when drawing a redistricting plan. *Bone Shirt v. Hazeltine*, 387 F. Supp. 2d 1035, 1042 (D.S.D. 2005) (directing that a court should apply traditional state districting principles); *Arizonans for Fair Representation v. Symington*, 828 F. Supp. 684, 688 (D. Ariz. 1992), *aff'd*, 507 U.S. 981 (1993) (a court may look to several neutral criteria in drawing a redistricting plan that is politically fair); *Alexander v. Taylor*, 51 P.3d 1204, 1211 (Okla. 2002) ("Widely recognized 'neutral redistricting criteria' may be considered" when drawing a redistricting map.").

**{34}** The bipartisan New Mexico Legislative Council adopted guidelines which set forth policies that are similar to policies that have been recognized as legitimate by numerous courts. Testimony during the trial revealed that these guidelines, or other guidelines very similar in substance, have been followed in New Mexico since 1991. These guidelines were followed by the court in *Jepsen*, and should be considered by a state court when called upon to draw a redistricting map. The policies set forth in the guidelines that are relevant to state districts include:

b. State districts shall be substantially equal in population; no plans for state office will be considered that include any district with a total population that deviates more than plus or minus five percent from the ideal.

. . .

d. Since the precinct is the basic building block of a voting district in New Mexico, proposed redistricting plans to be considered by the legislature shall not be comprised of districts that split precincts.

e. Plans must comport with the provisions of the Voting Rights Act of 1965, as amended, and federal constitutional standards. Plans that dilute a protected minority's voting strength are unacceptable. Race may be considered in developing redistricting plans but shall not be the predominant consideration. Traditional race-neutral districting principles (as reflected below) must not be subordinated to racial considerations.

f. All redistricting plans shall use only single-member districts.

g. Districts shall be drawn consistent with traditional districting principles. Districts shall be composed of contiguous precincts, and shall be reasonably compact. To the extent feasible, districts shall be drawn in an attempt to preserve communities of interest and shall take into consideration political and geographic boundaries. In addition, and to the extent feasible, the legislature may seek to preserve the core of existing districts, and may consider the residence of incumbents.

**{35}** Some comment is necessary regarding these guidelines. Single-member districts are required by Section 3(C), Article IV of the New Mexico Constitution. Districts designed with contiguous precincts that are as compact as practicable are intended to comply with the requirements of NMSA 1978, Section 2-7C-3. Compactness and contiguity are important considerations because these requirements help to reduce travel time and costs. These considerations make it easier for legislative candidates to campaign for office, and once they are elected, to maintain close and continuing contact with the people they represent. It has also been suggested that compactness and contiguity greatly reduce, although they do not eliminate, the possibilities of gerrymandering. Daniel D. Polsby & Robert D. Popper, *The Third Criterion: Compactness as a Procedural Safeguard Against Partisan Gerrymandering*, 9 Yale L. & Pol'y Rev. 301, 326-34 (1991).

**{36}** Similarly, considering political and geographic boundaries furthers our representative government. Minimizing fragmentation of political subdivisions, counties, towns, villages, wards, precincts, and neighborhoods allows constituencies to organize effectively and decreases the likelihood of voter confusion regarding other elections based on political subdivision geographics. *See Prosser v. Elections Bd.*, 793 F. Supp. 859, 863 (1992).

16

**{37}** With respect to the legislative policy of preserving communities of interest, we recognize that this criterion may be subject to varying interpretations. We interpret communities of interest to include a contiguous population that shares common economic, social, and cultural interests which should be included within a single district for purposes of its effective and fair representation. *See O'Sullivan*, 540 F. Supp. at 1204. The rationale for giving due weight to clear communities of interest is that "[t]o be an effective representative, a legislator must represent a district that has a reasonable homogeneity of needs and interests; otherwise the policies he supports will not represent the preferences of most of his constituents." *Prosser*, 793 F. Supp. at 863.

**{38}** Incumbency considerations present their own difficulties. The United States Supreme Court in *Karcher*, 462 U.S. at 740, held that the legislative policy of avoiding contests between incumbents was included among legitimate objectives, which "on a proper showing could justify minor population deviations." *See also White*, 412 U.S. at 791 ("[I]n the context of state reapportionment . . . the fact that 'district boundaries may have been drawn [to] minimize[] the number of contests between present incumbents does not in and of itself establish invidiousness.'" (quoting *Burns v. Richardson*, 384 U.S. 73, 89 n.16 (1966)); *Gaffney*, 412 U.S. at 752. However, incumbency protection cannot be justified if it is simply for the benefit of the officeholder and not in the interests of the constituents. *League of United Latin Am. Citizens*, 548 U.S. at 403.

**{39}** In summary, we interpret United States Supreme Court precedent to permit courts encumbered with the responsibility to draw redistricting maps to be guided by legislative policies underlying state plans to the extent the policies do not violate either the constitution or the Voters Rights Act. *Perry v. Perez*, ___ U.S. ___, ___, 132 S. Ct. 934, 941-42 (2012) (per curiam). A court is not required to rigidly adhere to maximum population equality as long as the court can enunciate the state policy on which it relies in deviating from the ideal population. By only deviating for enunciated state policy reasons, the court complies with the constitution and furthers the state's interests. In this case, we interpret the district court to have concluded that it was bound to a plus-or-minus one-percent population deviation with the sole exception of addressing the requirements of the Voting Rights Act. This conclusion does not conform to our view of the proper legal standard to be applied in redistricting cases as articulated above. Thus, we remanded this matter to the district court to draw its own redistricting map to avoid, to the extent possible, partisan bias, and to determine whether it could implement legitimate state policies by employing a more flexible approach to ideal population equality without departing from constitutional considerations.

## THE DISTRICT COURT SHOULD HAVE SCRUTINIZED ALL OF THE PLANS FOR POLITICAL CONSIDERATIONS

**{40}** The district court considered evidence regarding the partisan bias of various plans, and acknowledged the same in its findings of fact and conclusions of law. However, the plan ultimately adopted by the district court, Executive Alternative Plan 3, did not undergo the same scrutiny for partisan bias that the majority of the plans that were previously considered

had undergone. The executive parties introduced Executive Alternative Plan 3 into evidence on the last day of trial, after the political science experts who had scrutinized the plans before the district court were no longer available to testify. This plan was introduced during the testimony of Brian Sanderoff. Mr. Sanderoff pointed out the existence of significant partisan performance changes as compared with previously introduced executive plans; plans which the district court had previously heard from experts were partisan-neutral. Consistent with that testimony about partisan performance changes, the district court found that Executive Alternative Plan 3 increased Republican swing seats from five to eight over prior partisan-neutral executive plans. In addition, the number of majority Republican districts increased from 31 in the original executive plan to 34 in Executive Alternative Plan 3.[3] Mr. Sanderoff testified that Executive Alternative Plan 3 could have been drafted with less partisan change, perhaps with the use of slightly greater population deviations. Because of both this testimony and the district court's rejection of other plans for perceived partisan bias considerations, and because of its own recognition that the plan contained significant partisan performance changes, the district court should have rejected Executive Alternative Plan 3 as well. At a minimum, the district court should have slowed the process down enough to determine whether the significant partisan performance changes could have been ameliorated by consideration of legitimate state policies and a more flexible approach to population deviations that would not offend the constitution.

**{41}** The incumbent pairings in Executive Alternative Plan 3 appear to have contributed to the plan's partisan performance. Six districts were consolidated in areas that were underpopulated, two strong Democrat districts in North Central New Mexico, two strong Republican districts in Southeastern New Mexico, and a strong Republican district and a strong Democrat district that were consolidated in Central Albuquerque. The consolidated North Central district remained a strong Democrat district and the consolidated Southeastern district remained a strong Republican district. However, the consolidated Central Albuquerque district became a strong Republican district. When the vacant districts were moved to the more populous areas West of Albuquerque, two strong Republican and one strong Democrat districts were created. The result was a partisan swing of two strong seats in favor of one party. The three new seats, two Republican and one Democrat, correctly reflected the political affiliation of the population in the overpopulated areas on the West side of Albuquerque and in Rio Rancho, a result we do not question. However, the source of those three seats has a questionable partisan bias. Two of the consolidated seats, one a Democrat-Democrat consolidation in North Central New Mexico, and the other a Republican-Republican consolidation in Southeastern New Mexico, are partisan-neutral in effect. The third consolidated district in Central Albuquerque is the one that raises questions. Despite combining a Republican and a Democrat seat, it resulted in a strongly partisan district favoring one party, in effect tilting the balance for that party without any valid justification. The resulting district is oddly shaped in an area where compactness is

---

[3]How these findings of fact are relevant and material to the status quo was not completely developed at the district court level.

apparently relatively easy to achieve, suggesting, at least in part, that the district was created to give political advantage to one party. This result was not politically neutral and raises serious questions regarding its propriety in a court-ordered plan that should be partisan-neutral and fair to both sides. Stated differently, a more competitive district should have been created if at all practicable to avoid this political advantage to one political party and disadvantage to the other. Competitive districts are healthy in our representative government because competitive districts allow for the ability of voters to express changed political opinions and preferences. *See Alexander*, 51 P.3d at 1212.

**{42}** Although consolidation of districts coupled with moving one of the consolidated districts is not the only way to address population disparities when drawing new district boundaries to comply with the Equal Protection Clause, in this case the district court appropriately exercised its equitable powers to insist on the consolidation of districts in the underpopulated regional areas of North Central and Southeastern New Mexico, as well as Central Albuquerque. The problem previously noted with the Central Albuquerque consolidation is not the fact that the consolidation occurred, but the manner in which the consolidation was accomplished.

**SPECIFIC INSTRUCTIONS ON REMAND**

**{43}** In our previous order, we remanded this matter to the district court to draw a redistricting map with the assistance of an expert under Rule 11-706. The district court was instructed to include the Multi-Tribal/Navajo Nation partial plan within any redistricting map that the district court will draw. In addition, we required the district court to reject all of the previously submitted plans because of the political advantage sought by the parties. The accusation that we ordered the district court to reduce Republican seats in the House originates in the imagination of the accuser. We asked the court to draw its own map with the desired goal being to draw a partisan-neutral map that complies with both the one person, one vote constitutional doctrine, the requirements of the Voting Rights Act, and considers other historical and legitimate state redistricting principles. Although it has been suggested that a partisan-neutral map is illusory, the history of this case proves otherwise. The parties were able to draw maps that gave them each a political advantage and with population deviations that likely would have passed constitutional scrutiny. A court, with a cautious eye toward neutrality, can make the good faith effort to draw a map that advantages neither political party.

**{44}** Other concerns were alluded to in the order with the expectation that the district court would give such concerns due consideration. However, the order does not specifically direct the district court what to do, if anything, about those concerns. The district court continues to have the discretion necessary to carry out its equitable jurisdiction.

**{45}** We provided the district court with the following instructions which we repeat here so as to document the instructions in this published opinion.

In doing so, the district court should rely, as much as possible, on the evidence presently in the record, and it should not admit additional evidence from the parties. The district court should consider historically significant state policies as discussed herein through the use, where justified, of greater population deviations as set forth in the Legislative Council guidelines. At the district court's discretion, the parties may be permitted, but are not entitled, to file briefs identifying what state policies are supported by the evidence in the record that will assist the court in drawing a plan that results in less partisan performance changes and fewer divisions of communities of interest than the plan it adopted. Also in the district court's discretion, Brian Sanderoff would be a permissible candidate to serve as a Rule 11-706 expert, because of time constraints and his established expertise. Whether or not to use any of the maps that were introduced into evidence as a starting point, including Executive Alternative Plan 3, is within the discretion of the district court. The parties shall have an opportunity to comment on a preliminary plan proposed by the district court before it ultimately adopts a final plan. The final map must take into account the following considerations:

1. *Population deviations*. Executive Alternative Plan 3 achieved very low population deviations, but it was at the expense of other traditional state redistricting policies, the most evident being the failure to keep communities of interest, such as municipalities, intact. Some cities were divided to maintain low population deviations among the different districts. On remand, the district court should consider whether additional cities, such as Deming, Silver City, and Las Vegas, can be maintained whole through creating a plan with greater than one-percent deviations. While low population deviations are desired, they are not absolutely required if the district court can justify population deviations with the non-discriminatory application of historical, legitimate, and rational state policies.

2. *Partisan performance changes*. On remand, the goal of any plan should be to devise a plan that is partisan-neutral and fair to both sides. If the district court chooses to begin with the plan it adopted previously, it should address the partisan performance changes and bias noted in this order, and if the bias can be corrected or ameliorated with enunciated non-discriminatory application of historical, legitimate, and rational state policies, including through the use of higher population deviations, then the district court should do so.

3. *As part of the review of partisan performance changes, the district court should consider the partisan effects of any consolidations*. Any district that results from a Democrat-Republican consolidation, if that is what the district court elects to do, should result in a district that provides an equal opportunity to either party. In the alternative, some other compensatory

20

action may be taken to mitigate any severe and unjustified partisan performance swing. The performance of created districts as well as those left behind should be justified.

4. *Hispanic "Majority" District in House District 67.* It does not appear that the district court considered Hispanic citizen voting-age populations in reaching its decision, and it should do so on remand. Whatever its eventual form, the relevant Clovis community must be represented by an effective, citizen, majority-minority district as that term is commonly understood in Voting Rights Act litigation, and as it has been represented, at least in effect, for the past three decades.

**CONCLUSION**

**{46}** For all of the foregoing reasons, we remand this matter to the district court to draw its own House redistricting map, taking into consideration the legal principles we have announced herein. The district court was "urged to make every effort to conclude this matter expeditiously, no later than February 27th, 2012, or otherwise advise this Court." All claims raised by Petitioners have been addressed in this Court's Order No. 33,386, dated February 10, 2012, or are considered to be without merit. We emphasize that the principles articulated herein apply only to court-drawn maps. After this opinion was filed and before it was released for official publication, the district court entered a final decision complying with this Court's remand order. We take this opportunity to publish the district court's final decision as Appendix A to our opinion to document the history of this case and for future reference in the event New Mexico courts are called upon in the future to reapportion elective offices.

**{47}    IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

**JONATHAN B. SUTIN, Judge**

**Sitting by designation, dissenting**

**SUTIN, Judge (dissenting).**

**{48}** I respectfully dissent.

**{49}** Twelve years on the Court of Appeals has taught me to abide by rules relating to standard of proof and review. I therefore look at Judge Hall's work under that framework, instead of how the Majority frames its approach.

**{50}** The Majority reviews solely on a de novo basis. Majority Opinion ¶ 14. But the manner in which the Majority reviews on that basis necessarily combines weighing and finding facts as well as applying law. This case is not one involving pure questions of law. As the Majority acknowledges, Judge Hall sat as a court in equity. He had considerable discretion in arriving at his determinations. He considered all of the facts, and he made his determinations based on facts he thought supported his determinations. Judge Hall did not abuse his discretion—abuse of discretion is the traditional standard of review in equity. Judge Hall weighed and found facts, and nothing shows that his findings were not supported by substantial evidence —sufficiency of evidence is the traditional standard of review in regard to fact weighing and fact finding.

**{51}** The Majority justifies its approach for this reapportionment setting based on a theory that it "has a constitutional mandate to establish what the rule of law is and to clarify the law if it has not been interpreted correctly." Majority Order 13 (¶ 8). In my view, the Majority is out of bounds. Judge Hall did not interpret any law incorrectly. And, while the Majority has the prerogative to state what the rule of law is in New Mexico and to clarify the law, I see no reason for the Majority to have by-passed and ignored the traditional and important deference as to credibility determinations, fact finding, proof sufficiency, and discretion in equity given to trial judges, and then itself essentially assume the role of the trial judge while at the same time also then reviewing its own work. Long ago New Mexico stepped away from the territorial practice and procedure where a trial judge tried a case and, when the case was appealed, the same judge acting in the capacity of Supreme Court Justice reviewed his own decision for error. The Majority should not have stepped into Judge Hall's judicial shoes in this case.

**{52}** I expressed a good deal of my thoughts in my necessarily hurried dissent attached to the Majority's Order entered in this matter on February 10, 2012. For what it is worth as the lone wolf in this case, I repeat that dissent below because it is the Majority's Opinion and not its Order that is published. Also, because of time constraints, I was unable to address in my dissent to the Order the merits of the issues that were decided by the Majority in that Order, I will address the merits here.

**Clovis**

**{53}** In regard to Clovis, looking at the totality of circumstances based on the proof presented, Judge Hall saw no Voting Rights Act violation. He was in no way required to continue in force the nearly twenty-eight-year-old, elephant-truncated, unnaturally divided district created in *Sanchez*. Majority Opinion ¶ 20. The burden was on those contending that no change should be made to that then legally gerrymandered district to prove that no change should be made. The Majority errs in placing the burden on Judge Hall to have shown that certain population changes occurred in the district over the years that required a change. Further, it appears that the resulting district retained an Hispanic voting age population above 50%. In addition, Judge Hall found that "[a]ll of the plans before the Court contain a significant number of Hispanic majority districts; however, the Court finds no persuasive evidence that Sec. 2 of the Voting Rights Act requires any particular Hispanic majority district be drawn. Judge Hall also found that "[o]f all the plans presented to the Court, Executive Alternate Plans 1, 2, and 3 maintain the highest number of districts with a Hispanic [voting age population] over 50%."

**{54}** I would not hang my hat as the Majority does on *League of United Latin American Citizens* (*LULAC*). Majority Order 8, 12 (¶ 7); Majority Opinion ¶¶ 17, 31, 38. "The unique question of law" in *LULAC* was "whether it was unconstitutional for Texas to replace a lawful redistricting plan 'in the middle of a decade,' for the sole purpose of maximizing partisan advantage." 548 U.S. at 456. *LULAC* is a congressional redistricting case with very different facts and issues. Within the *Gingles* totality of the circumstances, Voting Rights Act evaluation requirement, *LULAC* addressed the proportionality factor and then considered citizen voting age population on a statewide basis after the district court made a finding regarding statewide citizen voting age population. *Id.* at 438. *LULAC* does not set down a rule or principle that necessarily governs Judge Hall's determinations.

**{55}** Those challenging the reapportionment with respect to Clovis failed in Judge Hall's assessment to prove the *Gingles* factors that would require a conclusion that the Voting Rights Act was violated and a remedial district must be formed. Furthermore, beyond the *Gingles* factors, neither the Majority nor a party has pointed out where data showing the percent of Hispanic citizen voting age population in the district in question was proved. In fact, one must question whether any underlying evidentiary support even exists to support such data for the particular district at issue. Brian Sanderoff, who worked on this case for the Legislative Council Service, and who apparently is Judge Hall's new Rule 706 expert at the strong suggestion of the Majority, testified that there was no data indicating the exact percentage of Hispanic citizen voting age population in the existing districts or in the districts contained in any of the plans. I believe the Majority erred in requiring Judge Hall to rethink the evidence, and the lack thereof, or obtain further evidence in order to arrive at what the Majority essentially holds is a mandatory Voting Rights Act remedial district. Majority Opinion ¶¶ 19-20; Majority Order 20-21 (¶ 4).

**Minimum Population Deviation**

**{56}** In regard to the one man-one vote requirement embedded in constitutional law, it is

obvious that Judge Hall was very much aware of and attuned to the applicable United States Supreme Court and federal cases, as well as state case law. He knew the law on acceptable deviation from minimum population requirements. He did not misunderstand, misconstrue, or misapply the law in any regard. He applied the law correctly. He deviated where it was necessary under the Voting Rights Act or under any legitimate State interest to do so. In adopting the Native American Plan in order to protect Native American interests, the Executive and Judge Hall had to deal with population dispersion "ripple-effect" complications resulting from that plan's insertion in the map. Judge Hall did not deviate where the circumstances and proof offered failed, in his view, to establish any Voting Rights Act violation or to establish that a legitimate State interest would require deviation. I believe the Majority erred in concluding that Judge Hall misconstrued the law or did not apply the law correctly and in instructing Judge Hall to rethink the evidence and change his mind so as to provide for even further deviation notwithstanding his view that proof requiring any such deviation was lacking.

**Partisan Effect**

{57}    I think the Majority is mistaken in thinking that the "public will" is measured solely or even primarily from an un-enacted legislative plan and is also mistaken in its thinking that plans can be fully partisan free. The legislative plan passed with all Republicans and some Democrats voting against passage. The Governor, elected by a will of the majority of voters, vetoed the plan. No attempt was made to override the veto. A highly qualified and experienced retired First Judicial District Court (Santa Fe) judge, who reflected no partisanship, scrupulously studied the facts and the law, and came to a considered and principled determination. Lawyers known to be highly partisan on both sides presented evidence and arguments. The Majority's view that "thoughtful consideration" means give more credence to the un-enacted legislative plan than to that offered and eventually modified by the Executive has no basis in law or reason. In no way has the "will of the majority of the people" or the "voice of the people" been "muzzle[d,]" Majority Opinion ¶¶ 21, 32-33, in the process here.

{58}    In challenging partisan effect, Petitioners Jennings and Lujan, as well as Maestas, indicated in their opening briefs that unlawful partisan bias is to be "significant." In their petition for writ of superintending control, Petitioners Maestas and Egolf used the phrases "blatant partisan bias" and "demonstrably partisan effect." Petitioner Egolf used "severe" in his opening brief. Petitioners Jennings and Lujan also used the phrase "significant partisan change" in their response brief. The Majority faults Judge Hall for not "slow[ing] the process down enough to determine whether the *significant* partisan performance changes could have been ameliorated[.]"  (Emphasis added.)  Majority Opinion ¶ 40.  Yet the Majority has not shown how any partisan effect here rises to a level of significance, severity, or blatancy sufficient to call for Judge Hall to rethink his work to arrive at "less partisan change[,]" *id.*; Majority Order 20 (¶¶ 2-3), much less to arrive at the Majority's required neutrality. Nor has the Majority shown how a new plan addressing a purported Republican swing-seat advantage will not result in an attackable maintenance of some Democratic

advantage. Judge Hall certainly did not indicate, with respect to swing seats, that there existed "significant" Republican partisan performance advantage and, when one considers Mr. Sanderoff's full testimony, Judge Hall could in his sound discretion have refused to view any Republican performance swing-seat advantage as justification for arriving at a different plan. Maintenance of and changes in seats of one party or the other is an understandable effect of the reapportionment process. As the majority recognizes, Judge Hall sat as a judge in a court of equity. Majority Order 6 (¶ 3). Considerably more must exist here to say that Judge Hall abused his discretion.

**Other Matters**

**{59}** Among other statements and implications in the Majority's Opinion that have given me pause are the following. First, Judge Hall, and thus his plan, did not "seek[]" partisan advantage. Majority Opinion ¶ 31. He did not try to "advance the purposes or the ability of one party to really elect a lot more people than the status quo." Majority Opinion ¶ 30 (internal quotation marks omitted). Judge Hall expressly did not allow partisan considerations to control the outcome of [his] decision." Furthermore, as I have discussed earlier in this dissent, Judge Hall's plan in no way produced any degree of even unintended partisan effect that required it to be overturned.

**{60}** Second, I believe that the Majority's various statements that attempt to show the Executive in bad light go nowhere. Despite implications to the contrary, nothing in the record indicates that those challenging Judge Hall's plan did not receive a fair hearing or were denied the opportunity to later examine the Executive's expert or to call their own expert back, and nothing indicates that the Executive acted in bad faith.

**{61}** Third, boiling the important cases down in terms of one man-one vote and population deviations based on legitimate state interests, cases in which the plans were enacted into law are inapposite. *Chapman* and *Connor* control here. *See also Reynolds*, 377 U.S. at 579 (stating that the "*overriding* objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the [s]tate" (emphasis added)). It bears repeating that Judge Hall did deviate, where he deviated he justified the deviation, and where Judge Hall did not deviate the record fails to reflect that those now challenging his plan justified deviations they felt were required under the law.

**{62}** Fourth, the Majority's "appearance of and actual scrupulous neutrality," Majority Opinion ¶ 31, principle does not hold water. It relies on misguided notions of "seek[ing] partisan advantage" and on "maintaining the political ratios as close to the status quo as is practicable[.]" *Id.* Return to the status quo can only mean return to the now, unconstitutional, over-ten-years-old-population districts—involving districts that have dramatically changed in population and districts that gave rise to the Democratic House seat total of thirty-eight and the Republican House seat total of thirty-two in 2011. There exists no recognizable validity to that status quo approach. Further, the partisan issue here is one

25

seat gained by Republicans, hardly something to require Judge Hall to return to the creative drawing board in search of the illusory notion of neutrality. Voters will "choose their representatives[,]" *id.*, just fine under Judge Hall's plan. The idea that Judge Hall was not "consistent and non-discriminatory" in applying legitimate State interests, *id.*, marginalizes, if not repudiates, a trial judge's basic and essential work and role in determining whether sufficient evidence exists to support a claim of inconsistency and discriminatory application of those interests. Such a notion outright and erroneously rejects Judge Hall's having given thoughtful consideration to the plans, policies, and interests. That rejection has no support in the record. Further, it seems to me a bit far fetched to engage in the hyperbolic phrases of "giv[ing] effect to the will of the majority of the people" and the "unaccept[ability] for courts to muzzle the voice of the people." Majority Opinion ¶¶ 32-33. Contrary to the view of the Majority, I believe that the integrity and legitimacy of the judiciary was not at risk in Judge Hall's hands nor were they diminished by Judge Hall's plan.

**{63}**    Fifth, based on what I have discussed throughout my dissents, the view that Judge Hall's plan "did not undergo the same scrutiny for partisan bias that the majority of the plans that were previously considered had undergone[,]" Majority Opinion ¶ 40, is unsupported in the record.

**Conclusion**

**{64}**    The Majority Opinion is long on the law but falls short on the battlefield decisions. Determinations expressly or impliedly holding that Judge Hall violated the Fourteenth Amendment and the Voting Rights Act are unsupported in the record. The actual effects about which the Majority is concerned, even if valid to any degree, are too insubstantial to require the remand and "do over" required of Judge Hall. Other than its references to the Clovis area with unsupportable reliance on citizen voting age population data, and its concern about partisan effect relating to one district in Central Albuquerque, the Majority points to no particular district it considers to be unlawfully established. Its tail-end instruction that Judge Hall "consider whether additional cities, such as Deming, Silver City, and Las Vegas[] can be maintained whole through creating a plan with greater than one-percent deviations." Majority Order 19 (¶ 1); Majority Opinion ¶ 45(1), has little, if any basis in the Majority's Order or Opinion. Based on the Majority's problematic review approach and erroneous intrusion into Judge Hall's bailiwick, on the Majority's unsupported view that Judge Hall incorrectly interpreted the law, on the Majority's vague analyses of actual error on Judge Hall's part requiring remand to revamp the plan, and on the minimal impact of whatever swing-seat advantage the Republicans may have gained, one must wonder why the Majority has gone to the lengths it has to overturn Judge Hall's plan.

**{65}**    Based on what I have set out above and below, I respectfully dissent. The Majority should have affirmed Judge Hall and his plan, while at the same time setting out whatever rules or principles the Court thought constituted the rules courts of this State should follow in reapportionment cases.

**{66}** The foregoing dissent has been prepared as Judge Hall is no doubt attempting to create a new plan that follows the dictates of the Majority. That plan will no doubt be affirmed by the Majority, given what Judge Hall is instructed to do.[4] My only hope is that Judge Hall does not expressly confess error.

**Repeat of Dissent to Order Previously Entered**

**{67}** The Majority's decision that its order be filed immediately has allowed me time and opportunity to only generally address why I oppose the remand requiring Judge Hall to revamp the plan according to the rules laid down by the Majority. The immediacy has not allowed me time and opportunity to rebut the Majority's determinations on the merits of the issues as contained in the order. Based on the detail in the order deciding the merits of the issues, and the requirement that Judge Hall change the plan, I tend to doubt that any follow-up Majority opinion will be needed, and I tend to doubt that the extensive detailed work required for a dissent will be useful.

**{68}** I respectfully oppose entry of the Majority's remand order. There exists no need to require Judge Hall to consider facts and law that he has already thoroughly considered. There exists no need for reconsideration of how Judge Hall applied the law of population deviation when it is clear that he understood the law and did not misapply it. Nor is there a need to remand for Judge Hall to reconsider facts (implying, it seems, to also change his mind) relating to any alleged Fourteenth Amendment or Voting Rights Act violation or relating to secondary factors such as communities of interest.

**{69}** Of course, this Court is not to rubber stamp Judge Hall's work and plan. At the same time, however, it is important to note that the Supreme Court's appointment of Judge Hall was purposeful and an excellent choice. Judge Hall was a highly respected judge for his fairness, good judgment, principled and rational decisions, seasoned analytic ability, and his ability to grasp complex issues. In his known judicial capacity, Judge Hall did not act arbitrarily. In these important circumstances, Judge Hall would not and did not, here, create a plan that he saw or felt or believed contained any partisan effect or bias that violated the Fourteenth Amendment. He would not have put forth a plan if the evidence supported a determination that the plan violated the Voting Rights Act. He would not have created a plan that would fail to withstand strict scrutiny. In his consideration of secondary factors, he would not have created a plan that, in his view, failed to protect communities of interest.

**{70}** Reapportionment cases are known for their rampant partisanship, whether at the

---

[4] Different than the language and tenor of its Order, the Majority now attempts to ameliorate what it has instructed by saying that the Order did "not specifically direct the district court what to do, if anything," about the Majority's "concerns[,]" and that the district court "continues to have the discretion necessary to carry out its equitable jurisdiction." Majority Opinion ¶ 44.

27

legislative level or in the court. The cases are complex. Population increase over ten years requires change. Redistricting is necessary. Expert map drawers, political scientists, and historians are involved. Witness testimony and documentary evidence fills volumes. The quest for the perfectly neutral reapportionment map devoid of partisan effect or bias is illusory. Parties and courts quote what they want from the United States Supreme Court and lower federal courts, as well as from state courts, for favorable language to support their positions.

**{71}** The overriding goal is population equality and to serve the constitutional principle of "one man-one vote." Once in court, the search involves pathways through various proposed plans offered by partisans. Those in power want to keep their seats and obtain more seats; those out of power want to keep their seats and obtain more seats. The court must give thoughtful consideration to the plans and listen to the arguments. First and foremost, the court sits in equity and tries to structure a plan within the constraints of the Fourteenth Amendment and the Voting Rights Act.

**{72}** If, in drawing a plan, the court exceeds minimal population deviation, the court must justify the deviation based on legitimate state interests which appear to consist of traditional state redistricting policies and practices. Here, the court started with the clear constitutional mandate of minimum deviation from population equality. At some point, Judge Hall determined that he was required to substantially deviate from population equality with regard to Native American communities in order to satisfy the requirements of the Voting Rights Act. Judge Hall appropriately justified the deviation. *See Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986) (explaining what proof is necessary for a court to find a violation of Section 2 of the Voting Rights Act).

**{73}** With respect to the population deviation that Judge Hall maintained at minimal levels, he had nothing to "justify" because that minimal deviation is what the law requires unless a deviation is necessary to satisfy legitimate state interests. Those attacking minimal deviation have the burden of advocating for a particular deviation and then justifying the deviation based on legitimate state interests. To the extent parties launched that attack, Judge Hall determined that the evidence presented was insufficient to require a deviation. To the extent that parties attacked Judge Hall's plan because it unfairly diluted Hispanic voting power, Judge Hall determined that the evidence presented was insufficient to support any claimed violation of the Fourteenth Amendment or the Voting Rights Act. Moreover, all of the plans split some communities of interest. Furthermore, communities of interest are defined in many different ways, they are what they are based on the eyes of the beholder, and are, for the most part, partisan driven.

**{74}** The parties now attacking Judge Hall's plan submitted extensive requested findings of fact and conclusions of law stating the various reasons why their respective plans should be adopted by the court. Judge Hall did not adopt their requested findings, thereby effectively finding against those parties and the propriety of their plans. The parties have not attacked with the required specificity Judge Hall's findings of fact, among which are:

that his plan includes thirty districts with Hispanic voting age population over 50%, maintaining the highest number of districts with a Hispanic voting age population over 50%; that incorporating the Native American plans caused the number of swing districts of 49-51% to increase from five to eight, and the number of majority Republican performance districts (over 50%) to reach 34; that his plan avoids splitting communities of interest (particularly the Native American communities of interest) to a reasonable degree; that he gave thoughtful consideration to all plans (plus amended, modified, and alternative), including the unenacted Legislative Plan; that he considered the totality of circumstances when considering whether the plan violated the Voting Rights Act.

{75}    The issues on which the Majority want to remand this case are intensely fact-based and fact-driven. This Court should not and has no need to (1) disregard the exceptional care Judge Hall took in determining whether the parties attacking the plan and advocating their own plans fulfilled their proof burdens and (2) draw a conclusion that, as a matter of law, those parties proved a Fourteenth Amendment or Voting Rights Act violation or that some secondary factor necessarily overrides the plan.

{76}    Nothing in this case shows that Judge Hall failed to consider all of the evidence presented. Nothing shows that he failed to give thoughtful consideration to everything offered by the parties. From the record and from his extensive findings of fact and conclusions of law, it is readily apparent that Judge Hall considered all of the evidence and gave thoughtful consideration to the presentations of the parties.

{77}    Judge Hall looked at the various plans, discussed his concerns about several of them, and made suggestions to parties about how they might improve the palatability of their plans by considering certain changes. Some made changes; others did not. This was the process Judge Hall chose instead of attempting to draw a virgin plan. In fact, to adopt aspects of plans proposed by the executive and legislative parties following extensive testimony and plan modifications indicates a process that considers the will of the people.[5] I do not agree with the Majority that Judge Hall's process was flawed because it did not satisfy a requirement of judicial neutrality or independence.

{78}    In my view, nothing in the Majority's cited case of *Peterson v. Borst*, 786 N.E.2d 668 (Ind. 2003), which involved a City-County redistricting plan, requires remand. I see no basis on which to question Judge Hall's or "the judiciary's" neutrality and independence given the nature of the trial; the manner in which Judge Hall conducted the trial; the parties' full opportunity to present their witnesses, documents, and arguments; Judge Hall's detailed

---

[5]I note that the "will of the people" was involved here from start to finish. While the legislative plan passed the House, all Republicans and a few Democrats voted against passage, the Governor vetoed the plan, any veto override was unlikely and not attempted, Judge Hall rejected the legislative plan, and several parties advocating their interests fully presented their positions and views at trial.

study of the various plans; and his interactions with the parties and recommended plan changes. Judge Hall handled this case "in a manner free from any taint of arbitrariness or discrimination." *See id.* at 672 (quoting *Connor v. Finch*, 431 U.S. 407, 415 (1977)).

{79} Ultimately, based on how he viewed all of the various plans and any modifications made, and based on how he evaluated the credibility of the witnesses, the models, the various analyses, and the reasonableness of testimony and counsel's arguments, Judge Hall thought that the Executive Plan, as modified, was a fair, reasonable, and appropriate plan.

{80} All plans suffered from partisan effect. Will any plan be devoid of some partisan effect? The parties that contend that the plan must be overturned state the standard to be "severe" and "significant" partisan bias. There exists no evidence in this case that Judge Hall intended or adopted a plan that violated the Fourteenth Amendment because of severe or significant partisan bias. Nothing in the plan shows any egregiousness, and nothing in the evidence indicates that any attempt at neutrality (which, although not a word used in the Order, is what I believe the Majority actually requires) or, even as the Order indicates, "less partisan effect," will relieve the challengers or the Majority of their view that any Republican advantage that results in seat gain from the status quo constitutes a partisan bias that violates the Fourteenth Amendment. Democrats keep their statewide majority under the plan. Several districts with Republican advantage are competitive. Judge Hall's plan was in no way driven by partisan bias. Nothing in the record indicates that Judge Hall's goal, much less overriding goal, was to effect partisan change. If the Majority wants Judge Hall to move things around to obtain "less partisan effect," does that take us to some sort of status quo, and will the status quo violate population shifting requirements? The answer to the question of partisan bias can depend in part on tests or models used. Several were under consideration. Judge Hall was not required to apply any one of them in particular or to rely on them as the sole basis on which to decide whether the proof showed a partisan effect or bias that violated the Fourteenth Amendment. Furthermore, no evidence bound Judge Hall to find that there was actual harm or undue prejudice to Democrats, who continue to maintain a majority of the seats in the House.

{81} There exists no basis on which to learn more from Judge Hall on any issue. Nothing in the record shows that Judge Hall abused his discretion in any respect. He did not misapprehend or misconstrue the law. He was in no way arbitrary. He does not need to provide further explanation about his determinations. Nothing proves that the plan will create serious problems in the future. This matter is not in need of remand. Judge Hall's plan is an appropriate stopping place. The election process needs to go forward now, without a delay of reconsideration or instruction essentially requiring Judge Hall to reduce Republican seats, without the delay of a 706 expert already shown through his testimony to have opinions about issues in the case, and without a delay involving the required opportunity to comment on any new plan or any changes. The stopping point of Judge Hall's plan is eminently more wise and fair than the stopping point of the next, reconstituted plan, with no fair opportunity to follow allowing the party opposing the plan to obtain relief in this Court.

_____

**JONATHAN B. SUTIN, Judge**

**Topic Index for *Maestas v. Hall*, Docket No. 33,386, consolidated with *Jennings v. NMCOA*, Docket No. 33,387**

**CT**  **CONSTITUTIONAL LAW**
CT-EP  Equal Protection

**GV**  **GOVERNMENT**
GV-EL  Elections

**RE**  **REMEDIES**
RE-EO  Extraordinary Writs

**STATE OF NEW MEXICO**
**COUNTY OF SANTA FE**
**FIRST JUDICIAL DISTRICT COURT**


BRIAN F. EGOLF, JR., HAKIM
BELLAMY, MEL HOLGUIN,
MAURILIO CASTRO, and ROXANNE
SPRUCE BLY

   Plaintiffs,

v

DIANNA J. DURAN, in her official
capacity as New Mexico Secretary of State,
SUSANA MARTINEZ, in her official
capacity as New Mexico Governor, JOHN
A. SANCHEZ, in his official capacity as
New Mexico Lieutenant Governor and
presiding officer of the New Mexico
Senate, TIMOTHY Z. JENNINGS, in his
official capacity as President Pro-Tempore
of the New Mexico Senate, and BEN
LUJAN, SR., in his official capacity as
Speaker of the New Mexico House of
Representatives,

   Defendants.

NO. **D-101-CV-2011-02942**

CONSOLIDATED WITH

**D-101-CV-2011-02944**
**D-101-CV-2011-02945**
**D0101-CV-2011-03016**
**D-101-CV-2011-03099**
**D-101-CV-2011-03107**
**D-202-CV-2011-09600**
**D-506-CV-2011-00913**

## DECISION ON REMAND

   This matter returns back before this Court on remand from the New Mexico Supreme Court. Following an evidentiary hearing on the merits regarding the redistricting of the New Mexico House of Representatives, this Court entered its Findings of Fact and Conclusions of Law and adopted a redistricting plan for the House of Representatives. In this Decision, the initial plan adopted by this Court will be referred to as the "First Court-Adopted Plan."

The First Court-Adopted Plan was reviewed by the New Mexico Supreme Court. The Supreme Court issued an Order (hereinafter "the Remand Order") returning the case to this Court with specific instructions on remand. Subsequently, the Supreme Court issued an Opinion (hereinafter "the Opinion") in Maestas, et al. v. Hall, No. 33386, which further addressed the issues in this case and the Remand Order.

The Remand Order directed this Court to draw a new reapportionment plan with the assistance of an expert under Rule 11-706 NMRA. The Remand Order stated that Brian Sanderoff of Research & Polling, Inc. would be a permissible candidate to serve in the role of a Rule 11-706 expert. Remand Order at pp. 18-19. This Court appointed Mr. Sanderoff as the Rule 11-706 expert. As suggested by the Remand Order, the parties were given an opportunity to file briefs identifying state policies that would assist the Court in drawing a plan that results in less partisan performance changes and fewer divisions of communities of interest. The Remand Order further directed that this Court "should rely, as much as possible on the evidence presently in the record, and it should not admit additional evidence from the parties."[1]   Remand Order at p. 18.

Following the receipt of the briefs and with the assistance of Mr. Sanderoff, the Court developed two preliminary plans which were provided to the parties for comment. The parties commented on the preliminary plans.[2]   This Court now adopts the plan identified as Preliminary Plan No. 1 without change. For purposes of this Decision, this plan will now

[1]In what appears to be a violation of this Supreme Court directive, the Egolf Plaintiffs submitted an Affidavit from Theodore Arrington, a witness who testified during the trial. In response to a Motion to Strike Dr. Arrington's Affidavit, the Egolf Plaintiffs contend that the Affidavit is appropriate because it is a part of their "comment" on the Court's Preliminary Plans. This argument is not persuasive. Clearly, an affidavit from an expert witness is evidence and the Supreme Court was quite clear that the parties not submit additional evidence; therefore, this Court does not consider the Affidavit of Dr. Arrington or any of the arguments based on that specific evidence.

Using a slightly different approach, the Maestas Plaintiffs submitted two proposed redistricting maps to this Court, but contend that the maps submitted are "for illustrative purposes only." Maestas Brief on Remand at p. 5. While it may be arguable whether this approach violates the letter of the Supreme Court directive, it certainly violates the spirit of the Remand Order. As a result, this Court does not consider the actual maps submitted by the Maestas Plaintiffs, but does consider the comments contained in the Maestas briefs.

[2]Preliminary Plan No. 2 included a different pairing of legislators in the North Central region. Although one party had initially proposed this new pairing in the briefs, no party argued that this Court should adopt Preliminary Plan No. 2 in their comments on the proposed plans and several parties contended that Preliminary Plan No. 2 was not based on the evidence presented at trial. After considering the issue, this Court agrees that the existing court record does not support the adoption of Preliminary Plan No. 2.

be referred to as the Final District Court Plan. This written Decision is intended to set forth this Court's conclusions in light of the Remand Order and Opinion of the Supreme Court.

In the Remand Order, the Supreme Court identified four areas in which the Supreme Court agreed with certain determinations made in the First Court-Adopted Plan. Remand Order at pp. 17-18. First, the Supreme Court agreed that the Native American districts should be included without change in the final court map. Second, the Supreme Court concluded that this Court "appropriately exercised its equitable powers to insist on the consolidation of districts in the underpopulated regional areas of North Central and Southeastern New Mexico, as well as Central Albuquerque." Remand Order at p. 17. Specifically, the Supreme Court recognized the partisan neutral nature of a Democrat-Democrat consolidation in North Central New Mexico and a Republican-Republican consolidation in Southeastern New Mexico. Remand Order at p. 15. Third, the Supreme Court agreed that this Court was not required to adopt the Legislative Plan as long as it gave that plan thoughtful consideration.[3] Fourth, the Supreme Court agreed that this Court was not required to preclude Governor Martinez from introducing plans during the litigation. In addition, in the Opinion, the Supreme Court specifically required this Court to reject all previously submitted plans "because of the political advantage sought by the parties." Opinion at p. 32.

In the Remand Order, the Supreme Court noted that the starting point for the creation of a final plan was left to this Court's discretion. After consideration, this Court concludes that the most appropriate starting point is the First Court-Adopted Plan. This Court adopts the First Court-Adopted Plan as the starting point for two reasons. First, the parties had an opportunity during the course of trial to evaluate and present evidence regarding the First Court-Adopted Plan, both in its final form and in earlier iterations of the plan ultimately adopted by this Court. If this Court were to develop a completely new plan from scratch at this time, the parties' input would be limited to a three-day comment period which would seem insufficient for a completely new plan (as opposed to a modification of a plan on which they already had input).

The second reason that this Court has used the First Court-Adopted Plan as a starting point is that the Supreme Court agreed with two important components of the First Court Adopted-Plan, i.e., the inclusion of the Native American districts without change and the consolidations of certain districts. Of the plans submitted during trial, only the final few plans submitted by the Executive Defendants and the First Court-Adopted Plan included both the Native American districts without change and the basic consolidations which the Supreme Court approved (i.e., a Democrat-Democrat consolidation in North Central New Mexico, a Republican-Republican consolidation in Southeastern New Mexico and a

_____

[3]This Court's thoughtful consideration of the Legislative Plan is specifically addressed in the Findings of Fact and Conclusions of Law. See Findings of Fact Nos. 32-41 and Conclusions of Law 27-28. All of those findings and conclusions are still applicable.

Democrat-Republican consolidation in Central Albuquerque[4]). Because the other plans introduced at trial do not include these two important components, this Court rejected the other plans as potential starting points.

With that background, this Court addresses the specific instructions of the Supreme Court on remand as follows: [5]

1.  *Population deviations.*

On remand, the district court should consider whether additional cities, such as Deming, Silver City, and Las Vegas, can be maintained whole through creating a plan with greater than one-percent deviations. While low population deviations are desired, they are not absolutely required if the district court can justify population deviations with the non-discriminatory application of historical, legitimate, and rational state policies.

Remand Order at p. 19.

In the First Court-Adopted Plan, the population deviation between districts ranged from +1.69% above the ideal population for a district to -4.99% below the ideal population for a district, a total range of 6.68%. The Remand Order of the Supreme Court directs this Court to determine whether additional cities can be maintained whole with additional deviations. [6]

---

[4]The concerns of the Supreme Court regarding the Democrat-Republican consolidation in Central Albuquerque are addressed below.

[5]As to each of the Supreme Court's four specific instructions, this Decision sets out the specific directive language of the Remand Order

[6]The Remand Order contains the following language: "In this case, the district court concluded that it was bound to a plus-or-minus one-percent population deviation with the exception of addressing Voting Rights Act infractions." Remand Order at pp. 13-14. This language was modified slightly in the Opinion which reads: "In this case, we interpret the district court to have concluded that it was bound to a plus-or-minus one-percent population deviation with the sole exception of addressing the requirements of the Voting Rights Act." Opinion at p. 27.

With all due respect to the Supreme Court, the Findings of Fact and Conclusions of Law do not support such an interpretation. This Court's Findings of Fact and Conclusions of Law do not adopt a +/- one percent deviation standard with the sole exception being violations of the Voting Rights Act. This Court made specific findings regarding Native American communities of interest. Findings of Fact Nos. 58, 59, 60, 67, 69 and 74. This Court also specifically concluded that more substantial deviations were justified not only based on the Voting Rights Act, but also based on significant state policies including

35

In the Final District Court Plan, Las Vegas and Deming are maintained whole within a single district. In addition, in contrast to the First Court-Adopted Plan, Mountainair and Tijeras are each contained within a single district in the Final District Court Plan.

Because Silver City was specifically identified in the Remand Order, this Court and the Rule 11-706 expert examined Silver City closely to determine if it was possible to unify Silver City within one district while still complying with the criteria set forth by the Supreme Court in the Remand Order and Opinion. As explained below, this Court ultimately concluded that Silver City could not be unified without violating the Supreme Court's clear direction that the plan be partisan-neutral.

The southwest area of New Mexico presents difficult challenges in this redistricting cycle. Under the current map, three districts (Districts 32, 38 and 39) are included in Grant, Hildago, Luna and Sierra Counties. The largest communities in these counties are Silver City, Lordsburg, Deming and Truth or Consequences. Under the current map, Silver City

---

protection of communities of interest. Conclusions of Law Nos. 24, 27, 33 and 34.

In fact, the standard adopted by the Supreme Court as to population equality and deviations is identical to the standard adopted and applied by this Court. In the Opinion, the Supreme Court examines the case law related to the application of legitimate and rational state policies on reapportionment plans and notes that, for plans which are "drawn by a legislature that have become law," ten-percent deviations are prima facie constitutional. Opinion at pp. 14-17. The Supreme Court goes on to set forth the standard as it relates to court-drawn plans:

> In contrast to legislatively-drawn plans, court-drawn plans are held to a higher standard, and "must ordinarily achieve the goal of population equality with little more than de minimus variation." *Chapman v. Meier,* 420 U.S. 2, 27 (1975). The United States Supreme Court has not defined what constitutes de minimus variations for a court-drawn plan. However, unlike a legislative body that does not have to articulate the policy reasons for minor deviations from ideal population equality, unless the range of deviations exceed ten percent, a court must enunciate the historically significant state policy or unique features that it relies upon to justify deviations from ideal population equality. *Connor v. Finch*, 431 U.S. 407, 419-20 (1977).

Opinion at pp. 17-18 (footnote omitted). In the footnote omitted here, the Supreme Court notes that court-drawn plans have had deviations of +/-4.96%, +/-6.6% and +/-9.26%, all percentages which are similar to the deviation of 6.68% in the First Court-Approved Plan.

Although some parties argued for a different standard during the trial, the legal standard on population equality that was adopted and applied by this Court matches the Supreme Court's recitation of the applicable law almost word-for-word. See Conclusions of Law Nos. 6, 8 and 17.

is split between District 38 (which is a Republican performing district with a Republican incumbent) and District 39 (which is a Democrat performing district with a Democrat incumbent). The Republican incumbent in District 38 lives in Silver City. The Democrat incumbent in District 39 lives very near Silver City in Bayard.

Based on the most recent census, this area of New Mexico no longer has sufficient population to support three full House districts. In fact, the population in this area is sufficient to support approximately 2½ House districts. As a result, at least one of these districts must now extend into Dona Ana County (where some population increases have occurred) for additional population. This expansion into Dona Ana County is necessary even if population deviations are expanded to +/- 5 percent.

Unifying Silver City presents two problems. First, it is difficult (but not impossible) to unify Silver City and still keep Lordsburg, Deming and Truth or Consequences unified in a single district. In other words, unifying Silver City most often results in splitting at least one of the other three communities. All four communities cannot be kept intact without pairing additional incumbents and/or impacting the partisan neutrality of the plan.

More importantly, unifying Silver City results in partisan change to these districts. In the split of Silver City under the current map, the precincts within Silver City which are part of District 39 tend to be more Democratic, while the precincts within Silver City which are part of District 38 tend to be more Republican than those precincts in District 39. The incumbent in District 38 lives within the city limits of Silver City; therefore, in the absence of an additional pairing of incumbents[7] , a unified Silver City would have to be included within District 38. Because this would involve the inclusion of additional precincts which tend to be more Democratic, District 38 would change from a Republican majority district to a Democrat majority district if Silver City is unified in District 38.[8] The Court and the Rule 11-706 expert examined whether this partisan change could be avoided through the use of higher deviations; however, the partisan change occurs even if deviations are increased

---

[7]This Court examined the possibility of pairing the two incumbents in the Silver City area. Under the Supreme Court directives, such a Democrat-Republican pairing would have to provide an equal opportunity to either party. Remand Order, p. 20. Accomplishing this goal would be very difficult without splitting communities other than Silver City. Moreover, the partisan performance measures for the newly created district would alter the partisan balance. Unlike the population growth in Rio Rancho and the west side of Albuquerque which can clearly be identified as supporting two Republican and one Democrat seat, identifying the appropriate partisan makeup of a new seat in the southwest area of the state is virtually impossible.

[8]An explanation of the methodology used to determine whether a particular district is Republican majority or Democrat majority is set forth below. See p. 10.

to +/- 5 percent.

For redistricting purposes, the competing interests here are unifying communities of interest as opposed to partisan neutrality. These competing interests cannot be accommodated by increased deviations up to +/- 5 percent. In the Remand Order and the Opinion, the Supreme Court emphasizes the importance of both partisan neutrality and unifying communities of interest; however, the Supreme Court does not give any guidance as to which of these two interests are to be given preference when they are in conflict and when that conflict cannot be removed with increased deviations.

This Court concludes that, in the particular circumstances present in southwestern New Mexico, maintaining partisan neutrality must take precedence over the admirable goal of unifying Silver City. This Court reaches this conclusion for several reasons. First, all plans must spilt some municipalities and communities of interest. Second, the current plan divides Silver City. Third, under most scenarios, unifying Silver City results in the split of at least one other substantial community in the region. Finally, the Supreme Court disapproved of this Court's adoption of the First Court-Approved Plan at least partially on the grounds that it had different partisan consequences than earlier versions of the Executive Plan. Many of the modifications from earlier versions of the Executive Plan were modifications made with the specific purpose of keeping identified communities of interest unified. See Findings of Fact Nos. 68 and 69 and Conclusions of Law 32 and 33. Because the Supreme Court concluded that the partisan effects of unifying additional communities of interest violated the requirement of partisan neutrality in the First Court-Approved Plan, this Court is hesitant to adopt a plan that unifies Silver City with attendant partisan consequences. [9]

2.    *Partisan performance changes.*

On remand, the goal of any plan should be to devise a plan that is partisan-neutral and fair to both sides. If the district court chooses to begin with the plan it adopted previously, it should address the partisan performance changes and bias noted in this order, and if the bias can be corrected or ameliorated with enunciated non-discriminatory application of historical, legitimate, and rational state policies, including through the use of

---

[9]The Court and the Rule 11-706 expert examined additional suggestions to unify other municipalities submitted by the parties in their comments on the preliminary plans. When those suggestions were incorporated into the plan, the result generally was some change in the partisan neutrality of the plan. Not surprisingly, the change in partisan neutrality generally benefitted the political party aligned with the party proposing the change. After discussion of each suggested change, the Court concludes that the partisan consequences of the proposed changes outweigh the potential benefit of the proposed unification of the identified municipality; therefore, the suggested changes were not adopted.

higher population deviations, then the district court should do so.

Remand Order at p. 20.

In reviewing the Remand Order and Opinion, the Supreme Court identified the following partisan performance changes and bias in the First Court-Adopted Plan: 1) the First Court-Adopted Plan increased Republican swing seats from five to eight over prior executive plans (Remand Order at p. 14); 2) the number of majority Republican districts increased from 31 in the original executive plan to 34 in the First Court Adopted Plan (Remand Order at pp.14-15); and 3) the incumbent pairings in the First Court-Adopted Plan contributed to partisan performance changes. (Remand Order at p. 15).[10] While the Remand Order compares the First Court-Adopted Plan to earlier executive plans in terms of majority Republican districts and Republican swing seats, the Opinion focuses more on the status quo: "[M]aintaining the political ratios as close to the status quo as is practicable, accounting for any changes in statewide trends, will honor the neutrality required in such a politically-charged case." Opinion at pp. 21-22.

The first step for this Court in carrying out the direction of the Supreme Court is to identify what constitutes the "status quo" in terms of the political ratios to be maintained. The Supreme Court gives no specific guidance on this issue. Both at the trial and in briefs submitted on remand, several parties argued that the Court should adopt the present political ratio between Republicans and Democrats in the New Mexico House of Representatives as the "status quo." See, e.g., Sena Plaintiffs Objections to Preliminary Plans No. 1 and 2, at p. 31. This Court rejects that approach because it places too much emphasis on the outcome of the most recent election. One need only consider the difference in results between the last two elections (2008 and 2010) to conclude that no single election accurately reflects the "status quo" for the State of New Mexico.

Instead, this Court concludes that a more appropriate measure of the "status quo" is the partisan make up of the current districts as reflected in the political performance data for each district as compiled by Research & Polling, Inc.[11] Although the trial testimony

_____

[10]The issue of incumbent pairings is addressed below.

[11]The Research and Polling partisan performance measurement is essentially the average of all statewide races that were held in New Mexico from 2004 to 2010, excluding outlier races in which a candidate won/lost by more than 20%. These results were then segmented at the legislative district level for each of the plans. This index does not include the legislative district races for various logistical and statistical reasons. The partisan performance measure is intended to show how the average statewide Democratic and Republican candidates have performed historically in each district. It is not intended to predict the outcome of each legislative race. The outcome of specific legislative races will be affected by many other factors such as the quality and resources of the candidates as well

39

contained some criticism of the Research and Polling formula, the formula does have the advantage of considering elections over the majority of the most recent decade, as opposed to focusing on a single election.

Applying this measure to the current districts, the political ratio for the "status quo" is 32 Republican majority districts and 38 Democrat majority districts. Because the Supreme Court Opinion mandates that the political ratios be maintained at the status quo, the Final District Court Plan incorporates the ratio of 32 Republican majority districts and 38 Democrat majority districts. [12]

In order to reach the political ratio under the status quo as required by the Supreme Court, this Court adjusted district boundaries for two districts so that those districts moved from slight Republican majority districts to slight Democrat majority districts. The two districts selected were District 32 and District 49. The Court selected these two districts because they are slight Democrat majority districts in the current plan. If one of the goals of the Supreme Court remand is to maintain the political ratios that exist under the "status quo," it made sense to consider these districts so that they do not change their slight majority Democrat status in the current plan. In addition, it should be noted that both of these districts remain competitive districts.

In the Remand Order and Opinion, the Supreme Court also noted that Republican swing seats increased in the First Court-Adopted Plan as compared to earlier executive plans. The First Court-Adopted Plan included eleven Republican majority districts within the swing seat category (defined as 50% to 53.9%) and five Democrat majority seats within the swing

---

as the mood of the state and nation at the time of the election. Despite this, the partisan measure appears to be a very accurate indicator of the party's candidate that may win the general election. Currently there are only three incumbents who are of the opposite party of what the measure indicates. And in each case, the partisan percentage is very close to indicating a toss up race: 49.3%, 50.6%, and 51.8%.

[12]In responding to the preliminary plans, the James Plaintiffs contend that the political ratio in the Final District Court Plan is not 38-32 because District 24 is evenly split at 50 percent. There are three responses to this contention. First, the split is not exactly 50-50; the actual calculation for District 24 is 50.03% Republican. A 50-50 split appears in the map packet only because the table only identifies percentages to one-tenth of a percentage point. Second, District 24 is the district that results from the Republican-Democrat pairing in Albuquerque. The Supreme Court has directed that this district should provide an equal opportunity to either party. Remand Order at p. 20. Finally, the current plan includes one district, District 43, which appears as a 50-50 split in the map packet but in reality is 50.02% Republican. To the extent it is argued that the political ratio in the Final District Court Plan is 38 Democrat majority districts, 31 Republican districts and one evenly split district, that ratio would also match the current districts as well.

seat category. Although it is not completely clear, it appears that the Supreme Court was concerned that the First Court-Adopted Plan contained significantly more Republican majority seats in the swing category, thereby giving Republicans a slight advantage in closely contested districts. To address this concern, the Final District Court Plan includes a total of fifteen districts in the swing category. Of these, eight are Republican majority districts and seven are Democrat majority districts. In the current districts, there are nine Republican majority districts and six Democrat majority districts. While the distribution of those seats across the spectrum from 50% to 53.9% can never be identical between the parties, the distribution resulting in the Final District Court Plan is relatively symmetrical. See the Political Performance chart attached to Preliminary Plan No. 1.

Finally, it is worth noting that the Final District Court Plan maintains very similar political performance percentages in the individual swing districts, as compared to the current districts.[13] In the Opinion, the Supreme Court notes that "[c]ompetitive districts are healthy in our representative government because competitive districts allow for the ability of voters to express changed political opinions and preferences." Opinion at p. 31. In the Final District Court Plan, the competitive seats under the current plan remain competitive.

3. *As part of the review of partisan performance changes, the district court should consider the partisan effects of any consolidation.*

Any district that results from a Democrat-Republican consolidation, if that is what the district court elects to do, should result in a district that provides

---

[13]In this regard, District 7 and District 8 may require some explanation. These two districts are in the Los Lunas/Belen area and are the subject of much argument from the parties because they are highly competitive districts. These districts are closely interrelated and changes in one district almost always affect the other. Consideration of these districts was further complicated by the fact that both share a boundary with District 49, which is a district that has been returned to a Democrat majority district under the mandate from the Supreme Court. To accomplish this, some Democrat leaning precincts in Belen were moved to District 49 while some Republican leaning precincts in Los Lunas were moved to District 8. Finally, there are communities within District 7 and District 8 which are split. In an apparent effort to gain a slight advantage in these competitive districts, some parties submitted suggestions under the guise of attempting to unify certain communities. Ultimately, the Final District Court Plan balanced these competing issues as follows: Both District 7 and District 8 remain as competitive districts, but District 7, which under the current plan had a Republican majority performance percentage, now has a Democrat majority performance percentage. Conversely, District 8, which under the current plan had a Democrat majority performance percentage, now has a Republican majority performance percentage. While both Los Lunas and Belen remain split under the District Court Final Plan, Los Lunas is now split between only two districts (District 7 and District 8) rather than three districts as is the case under the current plan.

an equal opportunity to either party. In the alternative, some other compensatory action may be taken to mitigate any severe and unjustified partisan performance swing. The performance of created districts as well as those left behind should be justified.

Remand Order at p. 20. [14]

In the First Court-Adopted Plan, an incumbent pairing was created in central Albuquerque between Representative Al Park (Democrat) and Representative Jimmie Hall (Republican) in District 28. The Supreme Court concluded that this consolidation "resulted in a strongly partisan district favoring one party, in effect tilting the balance for that party without any valid justification." Remand Order at p. 16. The Supreme Court also observed that District 28 in the First Court-Adopted Plan was an "oddly shaped" district. Id.

In the Final District Court Plan, this Court again adopts a Democrat-Republican consolidation in Central Albuquerque because such a consolidation is consistent with the overall population trends of the state. Because the Supreme Court has directed that any such pairing must provide an equal opportunity to either party, the Final District Court Plan adopts an incumbent pairing between Representative Al Park (Democrat) and Representative Conrad James (Republican) in District 24. Due to the political makeup of the individual precincts, it would be difficult (if not impossible) to create a district which pairs Representative Park and Representative Hall and results in near equality in the political performance percentages. As a result, the Court identified District 24 as a district which could pair Representative Park with a Republican legislator and still produce near equality in the political performance percentages. While the resulting District 24 is not as compact as the Court would prefer, the district does maintain some approximation of the shape of the prior District 24.

4.    *Hispanic "Majority" District in House District 67*

It does not appear that the district court considered Hispanic citizen voting age populations in reaching its decision, and it should do so on remand. Whatever its eventual form, the relevant Clovis community must be

---

[14]The final sentence in this provision of the Remand Order states: "[t]he performance of created districts as well as those left behind should be justified." This Court interprets this sentence to apply if this Court elected to include some consolidation other than those contained in the First Court-Adopted Plan. To the extent this Court needs to provide justification for the created districts in the Final District Court Plan, this Court would adopt the following statement of the Supreme Court: "The three new seats, two Republican and one Democrat, correctly reflected the political affiliation of the population in those high-growth areas on the west side of Albuquerque and in Rio Rancho, a result we do not question." Remand Order at p. 15.

42

represented by an effective, citizen, majority-minority district as that term is commonly understood in Voting Rights Act litigation, and it has been represented, as least in effect, for the past three decades.

Remand Order at p. 20-21. [15]

During the trial, this Court heard evidence regarding the minority population in Clovis and the history of District 63. Under the current plan, the bulk of the Hispanic population in and around Clovis was included District 63, a geographically large district

---

[15]The first sentence of this remand provision sets forth a very serious allegation regarding this Court's prior decision. The Remand Order contends that this Court did not consider Hispanic citizen voting age populations in reaching the decision. The consideration of minority voting issues is one of the central responsibilities of a Court in redistricting cases, both from a legal and a moral perspective. Given the Findings of Fact and Conclusions of Law, it is very difficult for this Court to understand how the Supreme Court could conclude that this Court did not consider Hispanic citizen voting age populations in reaching its decision. As it relates to the minority community in Clovis, this Court made specific findings regarding that community. Findings of Fact Nos. 64, 65 and 66. Most importantly, this Court made the specific finding that "Executive Alternate Plan 1 provides for a Hispanic majority VAP district in and around Clovis." Finding of Fact No. 66. This is the same district that is included in the First Court-Adopted Plan. The fact that the very district that contains the most significant Hispanic community in Clovis is a majority Hispanic voting age district should be a clear indication that this Court did consider Hispanic voting age populations in reaching a decision.

Moreover, a review of the entire First Court-Adopted Plan shows that this Court paid close attention to Hispanic voting age populations. This Court entered five Findings of Fact and Conclusions of Law specifically addressing Hispanic voting age population. Findings of Fact Nos. 64, 65, 66, and 71 and Conclusions of Law No. 26. Under the current plan, there are twenty-seven majority Hispanic voting age population districts. In the First Court-Adopted Plan, the number of majority Hispanic voting age population districts is increased to thirty. Of all the plans submitted to this Court by the Legislative Defendants, the James Plaintiffs, the Sena Plaintiffs, the Egolf Plaintiffs, the Maestas Plaintiffs, and the Executive Defendants, this Court selected a plan that had the highest number of majority Hispanic voting age population districts. This Court made an express finding to this effect. Finding of Fact No. 71.

The omission of these facts from the majority Opinion is important because the Opinion will become a permanent part of New Mexico law through its publication in the New Mexico Reports. Future readers of the majority Opinion, both in New Mexico and outside the state, will be left with the mistaken impression that this Judge failed to consider Hispanic voting age population in rendering a decision in this case, when in fact both the plan that was adopted and the Findings of Fact and Conclusions of Law demonstrate thorough consideration of minority populations.

which stretched from Clovis east through Fort Sumner and Santa Rosa, extending to the western boundary of Guadalupe County. The incumbent in District 63 resides in Santa Rosa, approximately 100 miles from Clovis. Under the current plan, the Hispanic voting age population in District 63 is 54.6%.[16]

In the First Court-Approved Plan, the Court adopted a plan which changed District 63 and District 67. The First Court-Approved Plan reconfigured District 67 as a compact, majority Hispanic voting age population district which included the principle minority populations in Clovis and Portales. Previously, District 67 had not been a majority Hispanic voting age population district; therefore, the First Court-Approved Plan added one additional majority Hispanic voting age population district to this area of the state. Under the First Court-Approved Plan, District 63 changed to a geographically large, but still compact, district which extended from Fort Sumner and Santa Rosa to the northeast corner of New Mexico. The Hispanic voting age population of District 63 remained relatively constant at 54.0%.

In adopting the First Court-Approved Plan, this Court noted the substantial increase in the number of majority Hispanic voting age population districts contained in the plan overall (Finding of Fact No. 71), but concluded, based on the totality of the circumstances, there was not "persuasive evidence that Sec. 2 of the Voting Rights Act requires any particular Hispanic majority district be drawn." Conclusion of Law No. 26. This Court was of the view that the burden of proof on the need for a particular minority-majority district rested with the party proposing such a district.

The Supreme Court Opinion shifts the burden of proof on this issue as it relates to a majority-minority district in Clovis: "Any redistricting plan ultimately adopted by the district court should maintain an effective majority-minority district in and around the Clovis area unless specific findings are made based on the record before the district court that Section 2 Voting Rights Act considerations are no longer warranted." Opinion at p. 14. This shift in the burden of proof changes the outcome. This Court cannot find on the present record that any party affirmatively proved that Section 2 Voting Rights Act considerations are no longer warranted; therefore, this Court interprets the remand from the Supreme Court to require that District 63 remain as close as possible to its present configuration and that, at a minimum, the percentage of the Hispanic voting age population not be decreased. These requirements are met in the Final District Court Plan. In the Final District Court Plan, 89.7% of the population in current District 63 is also contained within the boundaries of District 63. The Hispanic voting age population for District 63 in the Final District Court Plan is 57.0%, an increase of 2.4% over the current District 63. These changes do result in a decrease in the Hispanic voting age population in District 67 down to 39.7%, thereby reducing by one the total number of majority Hispanic voting age population districts in New Mexico.

---

[16]At the time of the litigation in *Sanchez v. King*, No. 82-00670M (D.N.M. 1984), the Hispanic population in District 63 was well below 50%.

For the reasons set forth above, this Court concludes that the District Court Final Plan complies with the Remand Order of the Supreme Court. Counsel for the Secretary of State is directed to immediately prepare an Amended Judgment and Final Order consistent with this Decision, obtain approval as to all counsel as to form, and submit it to the Court for immediate entry. [17]

Dated: _____          _____
                                        James A. Hall
                                        District Judge Pro Tempore

Copies to counsel of record via e-filing system.

---

[17]This Court would like to thank Brian Sanderoff, Michael Sharp and all the staff at Research and Polling, Inc. for their assistance as the Rule 11-706 expert. Their work was invaluable to this Court in addressing the issues raised in the remand from the Supreme Court.